IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLONIAL MEDICAL GROUP, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>CATHOLIC HEALTHCARE WEST, a California Not-For-Profit Corporation dba MERCY HOSPITAL; GOLDEN EMPIRE MANAGEMENT CARE, A MEDICAL GROUP, INC., a California Corporation; and MANAGED CARE SYSTEMS, LP,<br><br>Defendants. | No. C-09-2192 MMC<br><br>**ORDER GRANTING IN PART AND DEFERRING IN PART RULING ON DEFENDANTS' MOTIONS TO DISMISS; DISMISSING FIRST AND SECOND COUNTS WITH LEAVE TO AMEND; CONTINUING CASE MANAGEMENT CONFERENCE** |

Before the Court are two motions: (1) defendant Catholic Healthcare West dba Mercy Hospital's ("Mercy Hospital") Motion to Dismiss the First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), filed November 19, 2009; and (2) defendant Golden Empire Management Care, A Medical Group, Inc. and defendant Managed Care Systems, LP's (collectively, "GEMCare") Motion to Dismiss the First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), filed November 19, 2009 and amended by a Notice of Errata also filed on November 19, 2009. Plaintiff Colonial Medical Group ("Colonial") has filed a single opposition, to which Mercy Hospital and GEMCare have separately replied. Having read and considered the papers filed in support of and in opposition to the motions, the Court hereby rules as follows.

**BACKGROUND**

In its First Amended Complaint ("FAC"), Colonial alleges that it is "engaged in the business of providing medical services to individuals who are inmates in prisons or correctional institutions located in Central California, consisting of the counties of Fresno, Kern, Kings, Madera, Monterey, and San Luis Obispo." (See FAC ¶ 4.) Colonial alleges that in such geographic area, there exists a "product market" it describes as "the provision of medical services to prison inmates at secure or guarded hospital facilities." (See FAC ¶ 9.) According to Colonial, "secure" hospital facilities are "those which are locked down so that there is no public ingress or egress," while "guarded" hospital facilities are those with "normally conventional hospital rooms which are, when occupied by an inmate, under armed guard at the door and sometimes in the room as well and protected by barred and/or locked windows." (See id.)

Colonial alleges that two of its "competitors" in the above-described product market are GEMCare and Premier Physicians Alliance Group ("PPAG"). (See FAC ¶ 10.) Colonial also alleges that both Colonial and GEMCare have a "non-exclusive contract" with the California Department of Corrections and Rehabilitation ("CDCR") to provide medical services to California state inmates. (See FAC ¶¶ 11, 16.)[1] Colonial further alleges that Colonial, GEMCare, and PPAG have been "unsuccessful in securing authority to care for federal inmates" in federal prisons located in California City and Taft, each of which is operated by a private corporation, and that the "relatively few inmates at those [federal] institutions are cared for by physicians in those communities." (See FAC ¶ 12.)[2]

Colonial alleges that Mercy Hospital, located in Bakersfield, California, "has a 29 bed guarded unit and other guarded facilities, which other hospitals in the area do not"

---

[1] Colonial does not state whether PPAG has such a "non-exclusive contract," or any contract, with the CDCR, but does allege that PPAG "services a small number of inmates at the San Joaquin Community Hospital in Bakersfield." (See FAC ¶ 10.)

[2] The FAC includes no allegations setting forth who provides medical care to persons incarcerated in facilities other than those operated by the CDCR or by private corporations operating federal prisons.

1 (see FAC ¶ 11), and that Mercy Hospital has a contract with the CDCR "to provide hospital services to [the] CDCR's inmates" (see FAC ¶ 6). According to Colonial, the contract between Mercy Hospital and the CDCR requires that "the guarded facilities of defendant Mercy Hospital be devoted exclusively to state prison inmates under the control of [the] CDCR." (See FAC ¶ 11.) Colonial also alleges that at the time Colonial entered into its contract with the CDCR, it was "understood that Mercy Hospital was the only hospital that Colonial would use for CDCR inmates." (See id.)[3]

Colonial further alleges that when the CDCR determines an inmate needs medical care at a hospital and further determines that Colonial should provide the medical care, the CDCR "customarily" so advises Colonial and then transports the inmate to a facility which "in most instances" is Mercy Hospital. (See FAC ¶ 12.) When the CDCR decides to transport an inmate to Mercy Hospital, Colonial alleges, Colonial "contacts the Emergency Room at [ ] Mercy Hospital and advises the Emergency Room personnel of the anticipated arrival of its inmate patient"; if the Emergency Room physician determines the inmate should be admitted, a Colonial physician admits the inmate to Mercy Hospital and thereafter provides care to the inmate. (See id.)[4]

Colonial alleges that on or about April 28, 2009, Mercy Hospital entered into an "exclusive contract" with GEMCare, under which agreement GEMCare became "the exclusive provider of medical services to CDCR inmates admitted to Mercy Hospital through the Emergency Room." (See FAC ¶ 22.) Colonial alleges that Mercy Hospital, in connection with its having entered into the above-referenced contract with GEMCare,

---

[3] Additionally, Colonial alleges that the CDCR, in connection with "the latest proposed contract between the parties," has "requested a term that Colonial admit CDCR patients only to Mercy Hospital." (See id.) Colonial does not allege whether it has agreed or disagreed to such additional term, but alleges that it has "not finalized any new contract" with the CDCR "[g]iven the financial crisis which has engulfed the state of California." (See id.)

[4] Colonial does not specify the procedure employed when the CDCR determines that an inmate needs care, determines that Colonial should provide the care, and transports the inmate to a facility other than Mercy Hospital. Nor does Colonial describe the procedure employed when an inmate treated at Mercy Hospital is not admitted to the hospital through the Emergency Room.

3

"unilaterally modified the 'On Call' protocol" (see FAC ¶ 20), such that "Emergency Room personnel were to call [d]efendant GEMCare to provide care for inmates to the exclusion of Colonial physicians" (see FAC ¶ 21). According to Colonial, under such new protocol and beginning May 1, 2009, "inmate patients assigned to Colonial by [the] CDCR have been diverted by Mercy Hospital to physicians associated with GEMCare." (See FAC ¶ 29.)

Based on the above allegations, Colonial asserts five causes of action, the first of said causes of action alleging a claim under federal law and the remainder alleging violations of state law.

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." See Iqbal, 129 S. Ct. at 1950 (internal quotation and citation omitted); see,

1  e.g., Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047-48 (9th Cir. 2008) (holding plaintiff
2  who alleged "only ultimate facts" and "legal conclusions," rather than "evidentiary facts,"
3  failed to state claim under Sherman Act).

**DISCUSSION**

In their respective motions, defendants argue that each of the five counts alleged in the complaint is subject to dismissal for failure to state a claim.

**A. Count One ("Antitrust Under the Sherman Act")**

In Count One, Colonial alleges violations of §§ 1 and 2 of the Sherman Act. Defendants argue the Sherman Act claims are subject to dismissal.

**1. Product Market Allegations**

"Antitrust law requires [an] allegation of both a product market and a geographic market." Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008). This requirement applies to both § 1 and § 2 of the Sherman Act. See id. at 1044 n.3.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put," Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3rd Cir. 1997) (internal quotation and citation omitted), while "[c]ross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers," see id. at 438 n.6 (internal quotation and citation omitted).

Sherman Act claims are subject to dismissal "if the complaint's 'relevant market' definition is facially unsustainable." See Newcal Indus., 513 F.3d at 1045 (citing Queen City Pizza, 124 F.3d at 436-37)). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in

5

plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." Queen City Pizza, 124 F.3d at 436; see, e.g., Tanaka v. University of Southern California, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (affirming dismissal of antitrust claims where plaintiff athlete identified product market as "UCLA women's soccer program" but failed to allege any facts to support "conclusory" assertion that such market existed); Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1105 (9th Cir. 1999) (holding, where complaint alleged existence of "product markets for lodging accommodations and ski packages" in Big Bear Valley, district court properly dismissed antitrust claims because plaintiffs failed to allege "there are no other goods or services that are reasonably interchangeable with lodging accommodations or ski packages within [the] geographic market" of Big Bear Valley).

Here, in its initial complaint, Colonial alleged that the relevant "product market" was "the provision of inpatient medical services and treatment by medical doctors for inmates of the California prison system." (See Compl. ¶ 38 (emphasis added).) By order filed September 29, 2009, the Court dismissed the antitrust claims alleged in the initial complaint, for the reason that Colonial had failed to allege a cognizable product market; in particular, Colonial had defined the market by reference to a consumer, specifically, the CDCR. (See Order filed September 29, 2009, at 4-5); see also Newcal Indus., 513 F.3d at 1045 ("The consumers do not define the boundaries of the market; the products or producers do.").

In the FAC, Colonial now allege the relevant product market is "the provision of medical services to prison inmates at secure or guarded hospital facilities." (See FAC ¶ 4 (emphasis added).) Other than the addition of an allegation that the services are provided in medical facilities from which an inmate may not readily escape, Colonial's amended product market differs from the market alleged in the initial complaint only insofar as it replaces the phrase "inmates of the California prison system" with "prison inmates," and thus now includes federal as well as state prisoners therein. In other words, Colonial is proposing a market in which the only possible consumers of the alleged services, i.e.,

6

1  "products," are the CDCR and the two private corporations that operate federal prisons in
2  the six-county geographic region identified in the FAC.  Necessarily excluded from
3  Colonial's alleged product market are medical services provided at "secure or guarded
4  hospital facilities" to inmates incarcerated in city and county jails, to persons detained in
5  county jails pending the outcome of criminal proceedings, to military personnel held in the
6  detention facility at the United States Naval Air Station in Lemoore, and to persons
7  detained or confined by various federal, state, and local government agencies as a result of
8  orders of civil confinement or commitment.

9        The FAC, however, includes no allegations to support a finding that medical services
10  provided by Colonial and its competitors to persons incarcerated in prisons are not
11  reasonably interchangeable with medical services provided to persons who, for example,
12  are inmates of local jails or other locked facilities by reason of criminal or civil proceedings.
13  Consequently, Colonial's proposed product market is "legally insufficient." See Chapman v.
14  New York State Division for Youth, 546 F.3d 230, 238-39 (2nd Cir. 2008) (affirming
15  dismissal of antitrust claims; holding plaintiff's allegation of market for "restraint training
16  services to private child care providers" was legally insufficient, where plaintiff failed to
17  allege facts to "show how the market for restraint training services to child care providers is
18  any different from the larger market for restraint training services to other businesses,
19  agencies, and organizations"); see also Queen City Pizza, 124 F.3d at 436, 438 (affirming
20  dismissal of antitrust claims; holding plaintiff's allegation of market for "pizza supplies and
21  ingredients for use in Domino's stores" was legally insufficient, because "dough, tomato
22  sauce, and paper cups that meet Domino's Pizza, Inc. standards and are used by Domino's
23  stores are interchangeable with dough, sauce and cups available from other suppliers and
24  used by other pizza companies").

25        Accordingly, the First Cause of Action is, in its entirety, subject to dismissal for
26  failure to allege sufficient facts to support a finding that the product market identified in the
27  FAC is legally cognizable.
28  //

The Court will afford Colonial one further opportunity to properly allege a product market. For this reason, the Court finds it appropriate to consider at this time defendants' additional argument that, even assuming a properly alleged product market, Colonial nonetheless fails to state a claim under the Sherman Act.

**2. Section 1**

Section 1 of the Sherman Act provides that any "contract, combination . . ., or conspiracy, in restraint of trade or commerce" is "illegal." See 15 U.S.C. § 1.

Colonial alleges that "[t]he modification of the 'On Call' protocol and the Exclusive Coverage Services Agreement between defendants GEMCare and Mercy Hospital each constitutes a contract in an unreasonable restraint of trade" (see FAC ¶ 34), in that such agreements constitute "non-price vertical restraint[s]" (see FAC ¶ 36). In its opposition, Colonial clarifies that the alleged "restraint[s]" are "exclusive dealing arrangements." (See Pl.'s Opp. at 12:18-19.)

An "exclusive-dealing arrangement" does not violate antitrust laws unless "performance of the contract will foreclose competition in a substantial share of the line of commerce affected." See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).[5] "For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 373 F.3d 57, 68 (1st Cir. 2004); see also United States v. Microsoft Corp., 253 F.3d 34, 70 (D.C. Cir. 2001) (noting "roughly 40% to 50% share [of the relevant market] usually [is] required in order to establish a § 1 violation"); see, e.g., TCA Building Co. v. Northwestern Resources Co., 873 F. Supp. 29, 39 (S.D. Tex. 1995) (holding plaintiff failed to establish exclusive dealing arrangement violated Sherman Act, where buyer's "consumption represent[ed] only 33% of the consumption in the [relevant geographic] area

---

[5]Although Tampa Electric involved a claim under § 3 of the Clayton Act, the Ninth Circuit has held that the analysis set forth therein is applicable to a claim under § 1 of the Sherman Act, with the exception that the plaintiff alleging a § 1 claim must make a "greater showing of anti-competitive effect." See Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1275 (9th Cir. 1975).

8

. . ., leaving [the plaintiff] with almost 70% of the [relevant] market open to it").

Defendants argue that the FAC fails to include sufficient facts to support a finding that performance of the contract between Mercy Hospital and GEMCare will foreclose competition in the alleged relevant market. The Court, as discussed below, agrees.

Construed in the light most favorable to Colonial, the FAC alleges that as a result of the challenged contract between Mercy Hospital and GEMCare, when the CDCR brings an inmate in its custody to the Emergency Room of Mercy Hospital, such inmate, if thereafter admitted to Mercy Hospital, can only be treated by a GEMCare physician. Stated otherwise, the FAC alleges that medical providers in the relevant market are unable to compete with GEMCare for services rendered to the CDCR, specifically, medical services rendered to inmates in the custody of the CDCR to the extent such services are rendered after inmates are brought to Mercy Hospital's Emergency Room and thereafter admitted to Mercy Hospital for treatment.

The FAC does not allege, however, that the contract between Mercy Hospital and GEMCare has any effect on services sought by the CDCR to the extent the CDCR seeks treatment for inmates it does not bring to the Emergency Room of Mercy Hospital. More significantly, the FAC does not allege that the contract between Mercy Hospital and GEMCare has any effect on any consumer other than the CDCR. Further, as noted above, the FAC alleges that Mercy Hospital's contract with the CDCR requires Mercy Hospital to "devote[ ] exclusively to state prison inmates under the control of the CDCR" its "guarded facilities" (see FAC ¶ 11);[6] by which allegation a reasonable inference can be drawn that all other consumers in the alleged relevant market are using facilities other than Mercy Hospital.[7]

---

[6] It would appear that "guarded facilities," when read in context, is a reference to Mercy Hospital's "dedicated, secured and guarded floor." (See FAC ¶ 24.)

[7] As defendants note, the FAC alleges that the services rendered by medical providers can be rendered in any hospital room with a locking window, if an armed guard can be placed outside the room, (see FAC ¶ 9), a description that would appear to describe rooms in every hospital facility. Indeed, the FAC expressly alleges that medical services to incarcerated persons are rendered in facilities other than Mercy Hospital,

9

In sum, the FAC alleges that the exclusive dealing arrangement between Mercy Hospital and GEMCare only has an effect on competition among medical providers for the business of the CDCR to the extent the CDCR seeks medical care for inmates who are first brought by the CDCR to the Emergency Room of Mercy Hospital.  The FAC includes no facts, however, from which it reasonably could be inferred that the percentage of the product market foreclosed is sufficiently substantial to support a claim under § 1 of the Sherman Act.  See, e.g., Dickson v. Microsoft Corp., 309 F.3d 193, 209 (4th Cir. 2002) (affirming dismissal of § 1 claim based on "exclusive dealing" contracts; holding that because complaint failed to include "an allegation regarding [defendants'] power or share in the [relevant] market, there [was] no basis for concluding that [the] agreements at issue . . . [were] likely to foreclose a significant share of the relevant [product] markets").

Accordingly, the First Cause of Action is subject to dismissal to the extent it is based on a violation of § 1 of the Sherman Act.

**3. Section 2**

Section 2 of the Sherman Act provides that it is illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  See 15 U.S.C. § 2.  Here, Colonial alleges that GEMCare "has monopolized, and engaged in an attempt to monopolize, the provision of medical services at Mercy Hospital for inmates in Central California."  (See FAC ¶ 34.)[8]

"The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  Eastman Kodak Co. v.

---

specifically, in Memorial Hospital and San Joaquin Community Hospital, as well as in facilities, unnamed in the FAC, at which physicians provide medical care to federal prisoners incarcerated at institutions operated by private corporations.  (See FAC ¶¶ 6, 10, 11.)

[8]Colonial does not allege that Mercy Hospital has violated § 2.

Image Technical Services, Inc., 504 U.S. 451, 481 (1992). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).

At the outset, the Court finds that Colonial fails to state a claim because it does not allege, even as a conclusion, much less with the requisite evidentiary facts, that GEMCare has monopolized or has attempted to monopolize the alleged relevant market. The alleged relevant market is not the "provision of medical services at Mercy Hospital for inmates in Central California" (see FAC ¶ 34), but, rather, the "provision of medical services to prison inmates at secure or guarded hospital facilities" in Central California (see FAC ¶¶ 9, 10).[9]

Nor can the Court reasonably infer, from the facts that are alleged in the FAC, that GEMCare has monopolized or has attempted the monopolize the relevant market. The FAC does not set forth GEMCare's market share, does not allege that GEMCare provides medical services to any consumer in the relevant market other than the CDCR, and includes no facts to support a finding that GEMCare has the ability to control the prices charged by medical providers in the relevant market. Cf. Cost Management Services, Inc. v. Washington Natural Gas Co., 99 F.3d 937, 950-51 (9th Cir. 1996) (holding allegation defendant had 90% market share in relevant market, coupled with factual allegations to support finding defendant had ability to control prices and to exclude competition, sufficient to allege defendant had monopoly power). Further, as discussed above, Colonial does not allege that the contract between GEMCare and Mercy Hospital has an effect on any consumer in the relevant market other than the CDCR.

Moreover, because the alleged wrongful conduct by GEMCare consists of its having entered into the above-referenced contract with Mercy Hospital (see FAC ¶ 34), and the

---

[9]As discussed above, however, Colonial has failed to allege sufficient facts to support a finding there exists a market limited solely to the "provision of medical services to prison inmates at secure or guarded hospital facilities."

Court has found that Colonial has failed to state a § 1 claim based on such arrangement, Colonial's § 2 claim fails for this additional reason. See Cascade Cabinet Co. v. Western Cabinet & Millwork Inc., 710 F.2d 1366, 1374 n.3 (9th Cir. 1983) (holding where plaintiff bases § 1 claim and § 2 claim on same "concerted activity," plaintiff's failure to establish claim under § 1 precludes finding in favor of plaintiff on claim under § 2).

Accordingly, the First Cause of Action is subject to dismissal to the extent it is based on a violation of § 2 of the Sherman Act.

**B. Count Two ("Violation of the Cartwright Act")**

In Count Two, Colonial alleges a violation of California's Cartwright Act. Such claim is based entirely on the conduct on which Colonial bases its Sherman Act claims. (See FAC ¶¶ 42-44.)

"The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act." County of Tuolumne v. Sonora Community Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001); see also Marin County Board of Realtors, Inc. v. Palsson, 16 Cal.3d 920, 925 (1976) (holding "federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act").

Accordingly, for the reasons stated above with respect to Count One, Count Two is subject to dismissal.

**C. Remaining State Law Claims**

In Count Three, Colonial alleges defendants have violated §§ 650.01 and 650.02 of the California Business & Professions Code by engaging in "prohibited referral[s]" of medical care. (See FAC ¶ 47.) In Count Four, Colonial alleges a violation of § 17200 of the California Business & Professions Code and, in Count Five, Colonial alleges a claim for "tortious interference with contract and prospective economic advantage," each such claim based on all of the above-described statutory violations. (See FAC ¶¶ 49-50, 57-58.)

The Court will defer ruling on the sufficiency of Counts Three, Four, and Five, pending amendment, if any, of Colonial's Sherman Act claims. See 28 U.S.C. § 1367(c)(3)

(providing where causes of action over which district court has original jurisdiction have been dismissed, court may decline to exercise supplemental jurisdiction over remaining claims).

## CONCLUSION

For the reasons discussed above, defendants' motions to dismiss are hereby GRANTED in part and DEFERRED in part, as follows:

1. Counts One and Two are hereby DISMISSED, with leave to amend to cure the deficiencies identified above.

2. To the extent the motions seek dismissal of Counts Three, Four, and Five, ruling is hereby DEFERRED.

3. If Colonial elects to file a Second Amended Complaint to cure the deficiencies identified above, Colonial shall file its Second Amended Complaint no later than June 18, 2010. If Colonial does not file a Second Amended Complaint on or before June 18, 2010, the instant action will consist of the state law claims alleged in the FAC.

4. The Case Management Conference is hereby CONTINUED from June 25, 2010 to September 3, 2010. A Joint Case Management Statement shall be filed no later than August 27, 2010.

**IT IS SO ORDERED.**

Dated: May 25, 2010

MAXINE M. CHESNEY
United States District Judge